

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

1) Paul Tay,

**PLAINTIFF,**

-v-

1) Trent Shores, in his official capacity as United State Attorney, Northern District of Oklahoma,

**DEFENDANT,**

**Complaint and Request For Injunction**

Case No. _____

19 CV 609 JED - FHM

FILED

NOV 12 2019

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

I.  **The Parties to This Complaint**

    A.  **The Plaintiffs**

        Plaintiff No. 1

| | |
|---|---|
| Name | Paul Tay |
| Street Address | PO Box 481204 |
| City and County | Tulsa, Tulsa |
| State and Zip Code | Oklahoma 74148 |
| Telephone Number | (918) 892-0063 |
| E-mail Address | tulsamayor2020@gmail.com |

    B.  **The Defendant(s)**

        Defendant No. 1

| | |
|---|---|
| Name | R. Trent Shores |
| Job or Title | United States Attorney, Northern District of OK |
| Street Address | 110 W. 7th Street |
| City and County | Tulsa, Tulsa |

Counter IFP Filed of summons

        State and Zip Code    Oklahoma 74103

        Telephone Number    (918) 382-2755

### I. COMPLIANT

COMES NOW Plaintiff Paul Tay, for his causes of action against Defendants R. Trent Shores, in his official capacity as United States Attorney, Northern District of Oklahoma, alleges and states as follows:

The Parties

1. Plaintiff Paul Tay is and at all relevant times has been a resident of the Northern District of Oklahoma.

2. Defendant R. Trent Shores is and at all relevant times has been a resident of the Northern District of Oklahoma. Defendant Shores is currently employed as the United States Attorney, Northern District of Oklahoma, to be the top enforcer of the United States Code, at issue, 13 U.S.C. §§ 801-904, 951-971.

3. The Court has subject matter jurisdiction over all of the Plaintiff's federal-law claims pursuant to 28 U.S.C. § 1331, as each of those claims arise under federal law, i.e. the United States Constitution and 42 U.S.C. § 1983.

4. The Court has personal jurisdiction over the Defendants because they are all citizens and residents of the State of Oklahoma.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because all or part of the Plaintiff causes of action arose within the Northern District of Oklahoma.

### II. FACTUAL ALLEGATIONS

6. Plaintiff Tay, a private citizen, invokes the Ninth Amendment right to privacy, in as much as this very public suit allows, in his endeavors **to procure cannabis, by means of a credit card.**

7. **On the morning of 11 November 2019, Plaintiff attempted to purchase cannabis with a credit card, from Scott Tully, proprietor of the Green Goat Dispensary, 9435 E 51ˢᵗ Street, to take advantage of their new patient special, $1 per gram, with every $10 purchase.**

8. The clerk informed the Plaintiff Mr. Tully was not available. The Plaintiff would also be required to pay cash, like a common criminal, paying for contraband in a correctional facility.

9. The Plaintiff, unable to produce cash required for the purchase, profanely cursed into Mr. Tully's voicemail, promised to sue somebody, and angrily left the premises, unceremoniously denied of cannabis.

10. 5th Amendment of the U.S. Constitution states, "No person shall ... be deprived of life, liberty, or property, without due process of law."

11. 14th Amendment of the U.S. Constitution states, "nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

12. The Controlled Substances Act (CSA) is the statute establishing federal U.S. drug policy under which the manufacture, importation, possession, use, and distribution of certain substances is regulated. It was passed by the 91st United States Congress as Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970 and signed into law by President Richard Nixon. The Act also served as the national implementing legislation for the Single Convention on Narcotic Drugs.

The legislation created five schedules (classifications), with varying qualifications for a substance to be included in each. Two federal agencies, the Drug Enforcement Administration (DEA) and the Food and Drug Administration (FDA), determine which substances are added to or removed from the various schedules, although the statute passed by Congress created the initial listing.

Congress has sometimes scheduled other substances through legislation such as the Hillory J. Farias and Samantha Reid Date-Rape Prevention Act of 2000, which placed gamma hydroxybutyrate (GHB) in Schedule I and sodium oxybate (the isolated sodium salt in GHB) in Schedule III. Classification decisions are required to be made on criteria including potential for abuse (an undefined term), currently accepted medical use in treatment in the United States, and international treaties.

13. In *Roe v. Wade*, 410 U.S. 113 (1973), the Supreme Court issued a 7–2 decision holding that the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides a "right to privacy" that protects a pregnant woman's right to choose whether or not to have an abortion. However, it held that this right is not absolute, and must be balanced against the government's interests in protecting women's health and protecting prenatal life.

14. The Court classified the right to choose to have an abortion as "fundamental", which required courts to evaluate challenged abortion laws under the "strict scrutiny" standard, the highest level of judicial review in the United States.

15. In American constitutional law, strict scrutiny is the highest and most stringent standard of judicial review, and results in a judge striking down a law unless the government can demonstrate in court that a law or regulation:

1. is necessary to a "compelling state interest";
2. that the law is "narrowly tailored" to achieving this compelling purpose;
3. and that the law uses the "least restrictive means" to achieve the purpose.

It is part of the hierarchy of standards that courts use to determine which is weightier: a constitutional right or principle, or the government's interest against observance of the principle.

16. *United States v. O'Brien*, 391 U.S. 367 (1968) established the O'Brien standards under which narrow government interests may trump constitutional rights.

17. In the Second Report of the National Commission on Marihuana and Drug Abuse; Drug Use In America: Problem In Perspective (March 1973), "Drug abuse may refer to any type of drug or chemical without regard to its pharmacologic actions. It is an eclectic concept having only one uniform connotation: societal disapproval. ... The Commission believes that the term drug abuse must be deleted from official pronouncements and public policy dialogue. The term has no functional utility and has become no more than an arbitrary codeword for that drug use which is presently considered wrong."

18. The nation first outlawed addictive drugs in the early 1900s and the International Opium Convention helped lead international agreements regulating trade. The Food and Drugs Act of 1906 was the beginning of over 200 laws concerning public health and consumer protections. Others were the Federal Food, Drug, and Cosmetic Act (1938), and the Kefauver Harris Amendment of 1962.

In 1969, President Richard Nixon announced that the Attorney General, John N. Mitchell, was preparing a comprehensive new measure to more effectively meet the narcotic and dangerous drug problems at the federal level by combining all existing federal laws into a single new statute. With the help of White House Counsel head, John Dean; the Executive Director of the Shafer Commission, Michael Sonnenreich; and the Director of the BNDD, John Ingersoll creating and writing the legislation, Mitchell was able to present Nixon with the bill.

The CSA not only combined existing federal drug laws and expanded their scope, but it also changed the nature of federal drug law policies and expanded federal law enforcement pertaining to controlled substances. Title II, Part F of the Comprehensive Drug Abuse Prevention and Control Act of 1970 established the National Commission on Marijuana and Drug Abuse—known as the Shafer Commission after its chairman, Raymond P. Shafer—to study cannabis abuse in the United States.

19. During his presentation of the commission's First Report to Congress, Sonnenreich and Shafer recommended the decriminalization of marijuana in small amounts, with Shafer stating,

The criminal law is too harsh a tool to apply to personal possession even in the effort to discourage use. It implies an overwhelming indictment of the behavior which we believe is not appropriate. The actual and potential harm of use of the drug is not great enough to justify intrusion by the criminal law into private behavior, a step which our society takes only with the greatest reluctance.

20. The Controlled Substances Act consists of 2 subchapters. Subchapter I defines Schedules I-V, lists chemicals used in the manufacture of controlled substances, and differentiates lawful and unlawful manufacturing, distribution, and possession of controlled substances, including possession of Schedule I drugs for personal use; this subchapter also specifies the dollar amounts of fines and durations of prison terms for violations. Subchapter II describes the laws for exportation and importation of controlled substances, again specifying fines and prison terms for violations

21. The Drug Enforcement Administration was established in 1973, combining the Bureau of Narcotics and Dangerous Drugs (BNDD) and Customs' drug agents. Proceedings to add, delete, or change the schedule of a drug or other substance may be initiated by the DEA, the Department of Health and Human Services (HHS), or by petition from any interested party, including the manufacturer of a drug, a medical society or association, a pharmacy association, a public interest group concerned with drug abuse, a state or local government agency, or an individual citizen. When a petition is received by the DEA, the agency begins its own investigation of the drug.

The DEA also may begin an investigation of a drug at any time based upon information received from laboratories, state and local law enforcement and regulatory agencies, or other sources of information. Once the DEA has collected the necessary data, the Deputy Administrator of DEA requests from HHS a scientific and medical evaluation and recommendation as to whether the drug or other substance should be controlled or removed from control. This request is sent to the Assistant Secretary of Health of HHS. Then, HHS solicits information from the Commissioner of the Food and Drug Administration and evaluations and recommendations from the National Institute on Drug Abuse and, on occasion, from the scientific and medical community at large. The Assistant Secretary, by authority of the Secretary, compiles the information and transmits back to the DEA a medical and scientific evaluation regarding the drug or other substance, a recommendation as to whether the drug should be controlled, and in what schedule it should be placed.

The HHS recommendation on scheduling is binding to the extent that if HHS recommends, based on its medical and scientific evaluation, that the substance not be controlled, then the DEA may not control the substance. Once the DEA has received the scientific and medical evaluation from HHS, the DEA Administrator evaluates all available data and makes a final decision whether to propose that a drug or other substance be controlled and into which schedule it should be placed. Under certain circumstances, the Government may temporarily schedule a drug without following the normal procedure. An example is when international treaties require control of a

substance. In addition, 21 U.S.C. § 811(h) allows the Attorney General to temporarily place a substance in Schedule I "to avoid an imminent hazard to the public safety". Thirty days' notice is required before the order can be issued, and the scheduling expires after a year; however, the period may be extended six months if rulemaking proceedings to permanently schedule the drug are in progress. In any case, once these proceedings are complete, the temporary order is automatically vacated. Unlike ordinary scheduling proceedings, such temporary orders are not subject to judicial review.

The CSA also creates a closed system of distribution for those authorized to handle controlled substances. The cornerstone of this system is the registration of all those authorized by the DEA to handle controlled substances. All individuals and firms that are registered are required to maintain complete and accurate inventories and records of all transactions involving controlled substances, as well as security for the storage of controlled substances.

22. The Congressional findings in 21 USC §§ 801(7), 801a(2), and 801a(3) state that a major purpose of the CSA is to "enable the United States to meet all of its obligations" under international treaties. The CSA bears many resemblances to these Conventions. Both the CSA and the treaties set out a system for classifying controlled substances in several schedules in accordance with the binding scientific and medical findings of a public health authority. Under 21 U.S.C. § 811 of the CSA, that authority is the Secretary of Health and Human Services (HHS). Under Article 3 of the Single Convention and Article 2 of the Convention on Psychotropic Substances, the World Health Organization is that authority.

The domestic and international legal nature of these treaty obligations must be considered in light of the supremacy of the United States Constitution over treaties or acts and the equality of treaties and Congressional acts. In *Reid v. Covert* the Supreme Court of the United States addressed both these issues directly and clearly holding:

[N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.

Article VI, the Supremacy Clause of the Constitution, declares:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . ."

There is nothing in this language which intimates that treaties and laws enacted pursuant to them do not have to comply with the provisions of the Constitution. Nor is there anything in the debates which accompanied the drafting and ratification of the Constitution which even suggests such a result. These debates, as well as the history that surrounds the adoption of the treaty provision in Article VI, make it clear that the reason treaties were not limited to those made in "pursuance" of the Constitution was so that agreements made by the United States under the Articles of

Confederation, including the important peace treaties which concluded the Revolutionary War, would remain in effect. It would be manifestly contrary to the objectives of those who created the Constitution, as well as those who were responsible for the Bill of Rights—let alone alien to our entire constitutional history and tradition—to construe Article VI as permitting the United States to exercise power under an international agreement without observing constitutional prohibitions. In effect, such construction would permit amendment of that document in a manner not sanctioned by Article V. The prohibitions of the Constitution were designed to apply to all branches of the National Government, and they cannot be nullified by the Executive or by the Executive and the Senate combined.

There is nothing new or unique about what we say here. This Court has regularly and uniformly recognized the supremacy of the Constitution over a treaty. For example, in *Geofroy v. Riggs*, 133 U. S. 258, 133 U. S. 267, it declared:

"The treaty power, as expressed in the Constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the States. It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government, or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent."

This Court has repeatedly taken the position that an Act of Congress, which must comply with the Constitution, is on a full parity with a treaty, and that, when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null. It would be completely anomalous to say that a treaty need not comply with the Constitution when such an agreement can be overridden by a statute that must conform to that instrument.

According to the Cato Institute, these treaties only bind (legally obligate) the United States to comply with them as long as that nation agrees to remain a state party to these treaties. The U.S. Congress and the President of the United States have the absolute sovereign right to withdraw from or abrogate at any time these two instruments, in accordance with said nation's Constitution, at which point these treaties will cease to bind that nation in any way, shape, or form.

A provision for automatic compliance with treaty obligations is found at 21 U.S.C. § 811(d), which also establishes mechanisms for amending international drug control regulations to correspond with HHS findings on scientific and medical issues. If control of a substance is mandated by the Single Convention, the Attorney General is required to "issue an order controlling such drug under the schedule he deems most appropriate to carry out such obligations," without regard to the normal scheduling procedure or the findings of the HHS Secretary. However, the Secretary has great influence over any drug scheduling proposal under the Single Convention, because 21

U.S.C. § 811(d)(2)(B) requires the Secretary the power to "evaluate the proposal and furnish a recommendation to the Secretary of State which shall be binding on the representative of the United States in discussions and negotiations relating to the proposal."

Similarly, if the United Nations Commission on Narcotic Drugs adds or transfers a substance to a schedule established by the Convention on Psychotropic Substances, so that current U.S. regulations on the drug do not meet the treaty's requirements, the Secretary is required to issue a recommendation on how the substance should be scheduled under the CSA. If the Secretary agrees with the Commission's scheduling decision, he can recommend that the Attorney General initiate proceedings to reschedule the drug accordingly. If the HHS Secretary disagrees with the UN controls, however, the Attorney General must temporarily place the drug in Schedule IV or V (whichever meets the minimum requirements of the treaty) and exclude the substance from any regulations not mandated by the treaty, while the Secretary is required to request that the Secretary of State take action, through the Commission or the UN Economic and Social Council, to remove the drug from international control or transfer it to a different schedule under the Convention. The temporary scheduling expires as soon as control is no longer needed to meet international treaty obligations.

This provision was invoked in 1984 to place Rohypnol (flunitrazepam) in Schedule IV. The drug did not then meet the Controlled Substances Act's criteria for scheduling; however, control was required by the Convention on Psychotropic Substances. In 1999, an FDA official explained to Congress:

Rohypnol is not approved or available for medical use in the United States, but it is temporarily controlled in Schedule IV pursuant to a treaty obligation under the 1971 Convention on Psychotropic Substances. At the time flunitrazepam was placed temporarily in Schedule IV (November 5, 1984), there was no evidence of abuse or trafficking of the drug in the United States.

The Cato Institute's *Handbook for Congress* calls for repealing the CSA, an action that would likely bring the United States into conflict with international law, were the United States not to exercise its sovereign right to withdraw from and/or abrogate the Single Convention on Narcotic Drugs and/or the 1971 Convention on Psychotropic Substances prior to repealing the Controlled Substances Act.

The exception would be if the U.S. were to claim that the treaty obligations violate the United States Constitution. Many articles in these treaties—such as Article 35 and Article 36 of the Single Convention—are prefaced with phrases such as "Having due regard to their constitutional, legal and administrative systems, the Parties shall . . ." or "Subject to its constitutional limitations, each Party shall . . ."

According to former United Nations Drug Control Programme Chief of Demand Reduction Cindy Fazey, "This has been used by the USA not to implement part of article 3 of the 1988 Convention, which prevents inciting others to use narcotic or psychotropic

drugs, on the basis that this would be in contravention of their constitutional amendment guaranteeing freedom of speech".

23. There are five different schedules of controlled substances, numbered I–V. The CSA describes the different schedules based on three factors:

1. Potential for abuse: How likely is this drug to be abused?
2. Accepted medical use: Is this drug used as a treatment in the United States?
3. Safety and potential for addiction: Is this drug safe? How likely is this drug to cause addiction? What kinds of addiction?

The following table gives a summary of the different schedules.

|  | Potential for Abuse | Accepted Medical Use? | Potential for Addiction |
|---|---|---|---|
| Schedule I | High | None | Drug is not safe to use, even under medical supervision |
| Schedule II | High | Yes; sometimes allowed only with "severe restrictions" | Abusing the drug can cause severe physical and mental addiction |
| Schedule III | Medium[a] | Yes | Abusing the drug can cause severe mental addiction, or moderate physical addiction |
| Schedule IV | Moderate [b] | Yes | Abusing the drug may lead to moderate mental or physical addiction |
| Schedule V | Lowest[c] | Yes | Abusing the drug may lead to mild mental or physical addiction |

Placing a drug or other substance in a certain schedule or removing it from a certain schedule is primarily based on 21 USC §§ 801, 801a, 802, 811, 812, 813, and 814.

Every schedule otherwise requires finding and specifying the "potential for abuse" before a substance can be placed in that schedule. The specific classification of any given drug or other substance is usually a source of controversy, as is the purpose and effectiveness of the entire regulatory scheme.

The term "controlled substance" means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter.

The term does not include distilled spirits, wine, malt beverages, or tobacco, as those terms are defined or used in subtitle E of the Internal Revenue Code of 1986.

—21 U.S.C. § 802(6)

24. In the 1920s, Congress experimented with the prohibition of alcohol. On February 20, 1933, a new Congress acknowledged the failure of alcohol prohibition and sent the

Twenty-First Amendment to the states. Congress recognized that Prohibition had failed to stop drinking and had increased prison populations and violent crime. By the end of 1933, national Prohibition was history, though many states continued to outlaw or severely restrict the sale of liquor.

25. Internal Revenue Code Section 280E states "[n]o deduction or credit shall be allowed for any amount paid or incurred during the taxable year in carrying on any trade or business if such trade or business (or the activities which comprise such trade or business) consists of trafficking in controlled substances (within the meaning of schedule I and II of the Controlled Substances Act) which is prohibited by Federal law or the law of any State in which such trade or business is conducted."

26. 10th Amendment of the U.S. Constitution states, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

27. On 26 June 2018, the people of Oklahoma ratified State Question 788, setting the legal framework for decriminalized cannabis.

28. No U.S. Constitution articles, nor its amendments empower the federal government to criminalize or regulate a fundamental right of abortion or what citizens chose to put into their bodies. Judge Jim Gray, "It's none of their business."

## The Amount in Controversy

The amount in controversy shall be the amount as determined by the Court, $75,000 or over.

## III. Statement of Claim

29. Under the 14th Amendment Equal Protection Clause, government has no O'Brien interests to allow one class of citizens the right to destroy their bodies through the use of one or several particularly dangerous unscheduled substances, alcohol and tobacco, while criminalizing another class of citizens the right to destroy their bodies through use of other scheduled substances, i.e. cannabis, heroin, cocaine, etc.

30. Under the 14th Amendment Equal Protection Clause, government may not deny one class of users of dangerous substances the right to normal banking services, while denying others, under Internal Revenue Services Code Section 280E.

31. "Government has as much right to decide what citizens put into our bodies, as it does what we put into our minds. It's none of the government's business." ~~~Judge James P. Gray, Orange County, CA Superior Court.

## IV.     Irreparable Injury

32. The Plaintiff suffers the abridgment of the 14th Amendment Equal Protection Clause and injustice of unconstitutional government intrusion, allowing one class of users of highly dangerous substances, alcohol and tobacco, while denying another class the same rights to normal banking services and credit.

## V.      Relief

33. Plaintiff hopes and prays the Court apply "strict scrutiny," to review the Controlled Substance Act, the fundamental rights of the people, and the State.

34. Plaintiff hopes and prays the Court enjoins Defendant Shores, from prosecuting banks and other financial institutions from extending normal services to businesses engaged in purveying substances as scheduled in the Controlled Substances Act.

35. Plaintiff hopes and prays the Court summarily declare both the Controlled Substances Act and Internal Revenue Service Code Section 280E unconstitutional abridgments of fundamental rights, of free speech, due process, equal protection for individual persons, and the State, as representative of the people.

36. Plaintiff hopes and prays the Court summarily declares its actions ruling the Controlled Substances Act unconstitutional, to be sovereign, and supreme to any international treaties which may lay claim to the enforcement of the Act upon the sovereign citizens, both native born and naturalized, of the united states of America and also of non-citizen residents and visitors within the sovereign jurisdiction of the Court.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. Plaintiff in Pro Se

Date: 12 NOV 19

Signature_____

Paul Tay